## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Bankruptcy No. 05-30667-JAD |
| GILBERT BALKO and | ) | |
| ANNE BALKO, | ) | Chapter 13 |
| | ) | |
| Debtors. | ) | |
| _____ | X | |
| | ) | |
| GILBERT BALKO and | ) | Adversary No. 06-02001-JAD |
| ANNE BALKO, | ) | |
| | ) | Related to Document Nos. 14, 27, 29 |
| Plaintiffs, | ) | |
| | ) | |
| - v - | ) | |
| | ) | |
| CARNEGIE FINANCIAL GROUP | ) | |
| INC., PARAGON HOME | ) | |
| LENDING, CHET UNDERHILL, | ) | |
| ALLEGHENY APPRAISALS, | ) | |
| J.P. MORGAN CHASE BANK, | ) | |
| N.A., AS TRUSTEE, and | ) | |
| JOSEPH BEHRENS, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | X | |

Appearances:    David A. Colecchia, Esq. - Counsel to Debtors/Plaintiffs
Lyle D. Washowich, Esq., Reed Smith LLP - Counsel to J.P. Morgan
Chase Bank, N.A., as Trustee
Peter Nicholas Pross, Esq., Eckert Seamans Cherin & Mellott LLC -
Counsel to Paragon Home Lending
Charles E. Bobinis, Esq., The Bernstein Law Firm - Counsel to
Carnegie Financial Group, Inc.

## **MEMORANDUM OPINION**

The matter before the Court is a Motion to Dismiss filed by defendant, J.P. Morgan

Chase Bank, N.A., as Trustee ("J.P. Morgan"), along with joinders to the same filed by

defendants Carnegie Financial Group, Inc. ("Carnegie Financial") and Paragon Home

Lending ("Paragon").   Pursuant to the Motion to Dismiss, these defendants ask that the Court dismiss various lender liability and fraud-like causes of action filed by the debtors against the defendants.   For reasons set forth more fully in this Memorandum Opinion, the Court concludes that the Motion to Dismiss is, in part, well founded and, as a result: (1) Count 1 of the Complaint (as it relates to the debtors' objection to claim and purported claim sounding in recoupment) against J.P. Morgan shall be dismissed without prejudice; (2) Count 2 of the Complaint (Truth in Lending Act claims) shall be dismissed as to all defendants for failure to state a claim upon which relief may be granted; (3) Count 3 (common-law fraud claims) shall be dismissed as to J.P. Morgan and Paragon for lack of specificity in pleading and for failure to state a claim upon which relief could be granted; said dismissal shall be with prejudice as to J.P. Morgan and without prejudice as to the claims against Paragon; and (4) Count 4 (Pennsylvania Unfair Trade Practices and Consumer Protection Act claims) shall be dismissed as to J.P. Morgan and Paragon for lack of specificity in pleading and failure to state a claim upon which relief could be granted; said dismissal shall be with prejudice as to J.P. Morgan and without prejudice as to the claims against Paragon.   The Court denies the Motion to Dismiss with respect to the causes of action asserted in Counts  3 and 4 against defendants Carnegie Financial, Joseph Behrens, Allegheny Appraisals, and Chet Underhill.

## I. **BACKGROUND**

The plaintiffs, Gilbert and Anne Balko filed for bankruptcy protection under Chapter 13 of the United States Bankruptcy Code on August 18, 2005.   On January 3, 2006, the plaintiffs filed the instant adversary proceeding against the defendants.

The complaint filed by the plaintiffs is not a model of clarity. It is 30 pages in length, contains in excess of 230 paragraphs (including sub-parts), and has attached to it at least 30 exhibits. The gravamen of plaintiffs' complaint is lender liability.

In a nutshell, plaintiffs have asserted four causes of action against some or all of the defendants. Count 1 is an objection to the claim filed by J.P. Morgan in the Balko's bankruptcy case, (See Plaintiff's Objection to Claim Combined With Complaint for Fraud and Violation of the Truth in Lending Act (the "Complaint") at ¶¶ 70-74); Count 2 is a cause of action asserted by the plaintiffs against certain of the defendants (Carnegie Financial, Paragon, J.P. Morgan, and Joseph Behrens) under the Truth-In-Lending Act ("TILA"), 15 U.S.C.§ 1601, *et seq.*, as amended by the Home Ownership and Equity Protection Act, Pub.L. 103-325 ("HOEPA"),  (See Id. at ¶¶ 75-82);  Count 3 is a common-law fraud cause of action asserted by the plaintiffs against all defendants, (Id. at ¶¶ 83-81);[1] and Count 4 is a cause of action by plaintiffs against all defendants under Pennsylvania's Unfair Trade Practices Act and Consumer Protection Law, 73 P.S. §§ 201-1, *et seq.* (See Id. at ¶¶ 82-91).

The material allegations against the defendants are as follows:

1.      Defendant Carnegie Financial is a mortgage brokerage company, and one of its mortgage brokers was defendant Joseph Behrens. (Id. at ¶¶10, 11, 12, 21, 22).

2.      In January of 2003, the Balkos responded to a newspaper advertisement and contacted Carnegie Financial regarding the possible re-finance of their home mortgage and various credit card obligations. (Id. at ¶ 35).

---

[1] The Complaint filed by plaintiffs is misnumbered, contains several duplicately numbered paragraphs, and the error in paragraphing permeates Counts 3 and 4 of the Complaint.

3.     During ensuing conversations and/or communications between the Balkos and Mr. Behrens, the plaintiffs advised Carnegie Financial that the plaintiffs sought to refinance their mortgage due to, *inter alia*, the fact that the Balkos were having difficulty paying various credit card debt occasioned by Mr. Balko's unemployment and/or underemployment. (Id. at ¶¶ 36 and 37).

4.     In response to the Balko's inquiry, Mr. Behrens advised the Balkos that the Balkos needed a "band-aid" loan, which was allegedly described by Behrens as "a loan to last for two years and then be refinanced at a lower rate with no closing costs." Mr. Behrens allegedly further explained "that this loan was needed to improve Plaintiffs' credit score and lower Plaintiffs' debt to income ratio." Mr. Behrens also allegedly explained that "the interest rate for the band-aid loan would be two percentage points lower than Mr. Balko's current interest rate." (Id. at ¶ ¶39 - 41).

5.     Mr. Behrens allegedly promised the Balkos that the "band-aid" loan was "feasible and affordable, there would be no problems in refinancing two years [sic] so long as Plaintiffs made timely monthly payments, and the interest rate two years from then would be lower than the eight percent Mr. Behrens offered." Mr. Behrens also allegedly "assured the Plaintiffs that if [the Plaintiffs] made timely payments their payment would not change." (Id. at ¶¶ 42 and 43).

6.     As a result of Mr. Behrens' alleged representations, the Balkos agreed to pursue the proposed refinancing. Ultimately Carnegie Financial procured a lender who was willing to refinance the Balkos. The lender who ultimately

refinanced the Balkos' mortgage was Paragon. (Id. at ¶¶ 44, 52, 69, and Exhibit D).[2]

7.     In connection with the underwriting of the refinancing, defendant Carnegie Financial allegedly procured a false appraisal (from defendants Allegheny Appraisals and Chet Underhill) which overstated the value of the Balkos home[3] and, as a result, allegedly placed the loan with Paragon with the knowledge that Paragon would not "verify the information in the Balkos' application especially since Carnegie advertises loans at 100% equity with no income verification." (Id. at ¶¶ 46, 47 and 69).

8.     The closing on the loan occurred on March 24, 2003, and the amount financed by the Balkos was $222,840.33. (Id. at ¶ 52 and Exhibit J). In the complaint, the Balkos do not dispute that they received the benefit of the $222,840.33 loan; but they do allege that when the March 24, 2003 refinancing was completed, defendant Carnegie Financial allegedly failed to completely pay off numerous credit card balances held by the Balkos, despite "promising" to do so. (Id. at ¶¶ 65-68).

9.     Approximately two years after the closing of the refinancing, the Balkos attempted to again refinance the loan through Carnegie Financial. In

---

[2] At the May 26, 2006, no party disputed the fact that J.P. Morgan had no involvement whatsoever with the solicitation, underwriting, or closing of the March 2003 loan. In fact, J.P. Morgan's involvement in this case merely arises as a result of the fact that Paragon had, subsequent to closing of the loan, pooled and securitized the note and mortgage executed by the Balkos. As of the petition date, J.P. Morgan, as trustee, was the holder of the note and mortgage, and for this reason the Balkos named J.P. Morgan as a defendant to this action.

[3] The fair market of the home is allegedly $154,000 to $157,000 (depending on the appraisal methodology used), while the appraisal obtained by the lender during the course of underwriting the March 2003 loan valued the home at $300,000. (See Complaint at ¶ 88, Exhibit A, and Exhibit BB).

response to their request, the Balkos were informed that the Balkos "owed too much on their home compared to what it was worth" and, despite making several improvements to their home, the Balkos could not refinance their loan.  (Id. at ¶ 55, 57 and 58).

10.    Finally, the Balkos allege that due to the various purported acts of the several defendants, the Balkos were left with no equity remaining in their home and were forced to file for bankruptcy protection under the United States Bankruptcy Code in order to deal with claims of creditors.

## II.  STANDARD FOR MOTION TO DISMISS

Fed.R.Civ.P. 12 ("Rule 12") is incorporated into the Federal Rules of Bankruptcy Procedure by operation of Fed.R.Bankr.P. 7012.  In evaluating a motion to dismiss pursuant to Rule 12(b)(6) and Fed.R.Bankr.P. 7012(b)(6), the court must assume the facts alleged in the Complaint to be true and draw all factual inferences in favor of the nonmoving party, which in this case is the Balkos.  In re Loranger Mfg. Corp., 324 B.R. 575, 577-78 (Bankr. W.D.Pa. 2005) citing Schrob v. Catterson, 948 F.2d 1402, 1405 (3d Cir. 1991).  In order for a motion to dismiss to be successful, it must be clear that no relief could be granted to the plaintiff under any set of facts that could be proved consistent with the allegations in the complaint.  Lum v. Bank of America, 361 F.3d 217, 223 (3d Cir. 2004) citing Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

## III.  DISCUSSION AND ANALYSIS

The Balkos' Complaint contains four counts. Count 1 is an objection to the claim filed by J.P. Morgan.  Count 2 is an affirmative cause of action under the Truth-in-Lending Act filed by the Balkos against all of the defendants, with the exclusion of Chet Underhill and

Allegheny Appraisals.  Counts 3 and 4 are affirmative causes of action sounding in fraud

and for violation of Pennsylvania's Unfair Trade Practices Act and Consumer Protection

Law, respectively, against all defendants.  Because the predicate to the Balkos' objection to

J.P. Morgan's claim in Count 1 are the substantive causes of action asserted by the Balkos

in Counts 2 through 4, the Court will first analyze the merits of Counts 2 through 4 before

addressing the Balkos' objection to the claim of J.P. Morgan.

### Count 2
### <u>Violation of TILA and HOEPA</u>

Count 2 of the plaintiffs' Complaint alleges that defendants Carnegie Financial,

Paragon, J.P. Morgan and Joseph Behrens committed violations of TILA (as supplemented

by HOEPA) in connection with the March 2003 refinancing.  Specifically, the plaintiffs

allege that the March 2003 loan received by the Balkos was a "high cost" closed-end[4]

consumer transaction falling within the heightened disclosure provisions of HOEPA, and

that certain disclosures required by HOEPA were not made to the plaintiffs.  In their prayer

for relief, the Balkos ask for, among other things, rescission of the loan instrument,

statutory damages, attorney's fees and an injunction against all defendants precluding any

activity regarding foreclosure of the property securing the loan.  J.P. Morgan, Paragon, and

Carnegie Financial counter these allegations by claiming that the loan in question is not

governed by HOEPA and therefore no disclosures beyond those required under TILA itself

---

[4] "Closed-end" credit is defined as consumer credit "other than open-end credit as defined in this section."
<u>See</u> 12 C.F.R. § 226.2(a)(10), "Open-end" credit is defined in 12 C.F.R. § 226.2(a)(20) as consumer credit extended
by a creditor under a plan in which: (i) the creditor reasonably contemplates repeated transactions; (ii) the creditor
may impose a finance charge from time to time on an outstanding unpaid balance; and (iii) the amount of credit that
may be extended to the consumer during the term of the plan (up to any limit set by the creditor) is generally made
available to the extent that any outstanding balance is repaid.  An example of an "open-end" consumer credit
transaction would be a revolving loan obtained by an individual consumer in the form of the use of a credit card.

were necessary.  As discussed in greater detail below, the Court agrees with the defendants that the loan agreement entered into by the plaintiffs does not fall within the purview of HOEPA and therefore Count 2 of the Complaint fails to state a claim upon which relief may be granted.

TILA was enacted by Congress in 1968.  Its declared purpose is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him [or her] and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices."  15 U.S.C. § 1601(a); see Beach v. Ocwen Federal Bank, 523 U.S. 410, 412, 118 S.Ct. 1408, 1409-1410, 140 L.Ed.2d 566 (1998).  To achieve this goal, TILA requires creditors (as defined in 15 U.S.C. § 1602) to provide borrowers with clear and accurate disclosures of certain material terms.  See 15 U.S.C. §§ 1631, 1632, 1635, 1638.[5]

HOEPA is an amendment to TILA, enacted by Congress in 1994 in response to increasing reports of abusive practices in home mortgage lending.  Cooper v. First Gov't Mortgage and Investors Corp., 238 F.Supp.2d 50, 55 (D.D.C. 2002). At its core, HOEPA "creates a special class of regulated loans that are made at higher interest rates or with excessive costs and fees."  In re Cmty. Bank of N. Virginia, 418 F.3d 277, 304 (3d Cir. 2005).

---

[5] TILA vests the Board of Governors of the Federal Reserve System with the power to promulgate regulations for the interpretation and implementation of the statute. See 15 U.S.C.§ 1640(a).  "Regulation Z," 12 C.F.R. Part 226, sets forth the various disclosure requirements imposed upon creditors covered by TILA.  Such disclosure requirements include the requirement that creditors disclose the cost of credit as a dollar amount (i.e., the finance charge) and as an annual percentage rate.   Other disclosures required by Regulation Z include the obligation of a creditor to provide a borrower with clear and conspicuous notice of the borrower's right to rescind the transaction in accordance with the provisions of 15 U.S.C. § 1635(a).

As such, Congress has determined that HOEPA loans are subject to special disclosure[6] requirements above and beyond the disclosure requirements of TILA, and the statute imposes liability (upon creditors and assignees of creditors making such loans) in instances where material disclosures compliant with HOEPA are not timely made.[7] <u>See</u> 15 U.S.C. §§ 1639, 1641.

There are two alternative statutory tests to determine whether or not a closed-end credit transaction qualifies as a HOEPA loan. <u>See</u> 15 U.S.C. § 1602(aa)(1). Under the first test (the "Annual Percentage Test"), a loan is subject to HOEPA if the annual percentage rate payable on the loan exceeds by more than 10 percentage points the yield on Treasury securities having a comparable period of maturity (as measured on the fifteenth day of the month immediately preceding the month in which the application for the loan was received by the creditor). 15 U.S.C. § 1602(aa)(1)(A). As an alternative, the second test (the "Points and Fees Test") provides that a transaction will be governed by HOEPA if the total "points and fees" payable by the consumer at or before closing exceed the greater of (a) 8 percent of the total loan amount or (b) $400. 15 U.S.C. § 1602(aa)(1)(B). A determination under the Annual Percentage Test is rather simple; a court need do no more than peruse a copy of the Wall Street Journal in order to find the applicable rate(s) and perform the comparison. The Points and Fees Test, however, consists of a more in-depth analysis.

---

[6] Some of the additional disclosures required by HOEPA include the language "You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application" and "If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan" in conspicuous type size. <u>See</u> 15 U.S.C. § 1639(a)(1).

[7] As to assignee liability, HOEPA provides that "[a]ny person who purchases or is otherwise assigned a mortgage referred to in § 1602(aa) of this title shall be subject to all claims and defenses with respect to that mortgage that the consumer could assert against the creditor of the mortgage." 15 U.S.C. § 1641(d).

The plaintiffs in this case do not dispute that the annual percentage rate payable on the March 2003 loan does not exceed by more than the 10 percentage points the yield on applicable Treasury securities having comparable maturity.  Therefore, the March 2003 loan fails the Annual Percentage Test and HOEPA cannot be invoked on this basis.

The Balkos do allege that the "points and fees"[8] charged by the lender at closing of the March 2003 loan were in excess of 8% of the total amount financed, and therefore the Balkos allege that HOEPA has been implicated by operation of the Points and Fees Test. The defendants dispute the Balkos calculation of "points and fees" and suggest that the plaintiffs, in order to gerrymander the loan into HOEPA, have miscalculated the "points and fees" paid under the loan at issue.  Specifically, the defendants allege that the Balkos

---

[8] "Points and fees" is a term of art used in 15 U.S.C. § 1602(aa)(1)(B).  Regulation Z at  Section 226.32(b)(1) defines the term "points and fees" and states, in pertinent part:

> (b) Definitions.  For purposes of this subpart, the following definitions apply:
>
> (1) For purposes of paragraph (a)(1)(ii) of this section, points and fees means:
> (i) All items required to be disclosed under § 226.4(a) and § 226.4(b) [*i.e.*, the "Finance Charge"], except interest or the time-price differential;
> (ii) All compensation paid to mortgage brokers;
> (iii) All items listed in § 226.4(c)(7)[i.e., real estate related fees such as appraisal fees, fees for title examination, etc.] (other than amounts held for future payment of taxes) unless the charge is reasonable, the creditor receives no direct or indirect compensation in connection with the charge, and the charge is not paid to an affiliate of the creditor; and
> (iv) Premiums or other charges for credit life, accident, health, or loss-of-income insurance, or debt-cancellation coverage (whether or not the debt-cancellation coverage is insurance under applicable law) that provides for cancellation of all or part of the consumer's liability in the event of the loss of life, health, or income or in the case of accident, written in connection with the credit transaction.

See 12 C.F.R. § 226.32(b)(1) .

improperly included a "yield spread premium"[9] earned by the mortgage broker in the Points and Fees Test.  The Court agrees with the defendants.

The exhibits attached to the Balkos' Complaint reflect that the following "points and fees" paid by the debtors at closing of the March 2003 loan consisted of the following:

| | | |
|---|---|---|
| Loan Origination Fee | - | $9,588.00 |
| Wire Fee | - | $30.00 |
| Mortgage Broker Fee | - | $6,010.00 |
| Flood Certification Fee | - | $20.00 |
| Processing Fee | - | $495.00 |
| Underwriting Fee | - | $391.00 |
| Tax Service Fee | - | $84.00 |
| Settlement Fee | - | $300.00 |
| Courier Fee (Paragon) | - | $25.00 |
| | | |
| Total | - | $16,943.00[10] |

<u>See</u> (Complaint Exhibit C [HUD-1A Settlement Statement]).  These charges, totaling $16,943.00, equate to 7.6% of the total amount financed ($222,840.33).  These amounts fall below the 8% threshold set forth in 15 U.S.C. § 1602(aa)(1)(B) and consequently the March 2003 loan transaction fails to qualify as a transaction covered by HOEPA.  It is for this reason that the Balkos contend that the "yield spread premium" to be paid to the broker in this case should be included in the Points and Fees Test calculation.

It is understandable why the plaintiffs contend that the yield spread premium is included in the Points and Fees Test calculation.  Section 226.32(b)(1)(ii) of Regulation Z

---

[9] A yield spread premium is a "bonus paid to a broker when it originates a loan at an interest rate higher than the minimum interest rate approved by the lender for a particular loan." <u>In re Bell</u>, 309 B.R. 139, 153 n. 9 (Bankr. E.D. Pa. 2004).  A yield spread premium is not paid at closing of the loan.  Rather, during the term of the loan the lender rewards the broker each month by paying the broker a percentage of the yield spread earned by the lender. <u>Id</u>.

[10] Counsel for the plaintiffs' acknowledged that this total was accurate, stating to the Court at the May 26, 2006 hearing: "These [the fees encompassed within §§ 226.4(a) and (b) of Regulation Z as listed above] are all detailed, and I compliment Mr. Washowich [counsel for J.P. Morgan] in his brief...those are all detailed in his brief and they run to about $16,000."

expressly states that the term "points and fees" includes "All compensation paid to mortgage brokers," 12 C.F.R. § 226.32(b)(1)(ii), which on its face includes any yield spread premium paid to Carnegie Financial.  However, the answer to the question of whether or not a yield spread premium is included in the definition of "points and fees" does not end the matter.   HOEPA unequivocally states that the statute applies to certain mortgage transactions when "the total points and fees payable by the consumer **_at or before closing_** exceed the greater of - (I) 8 percent of the loan amount; or (ii) $400." 15 U.S.C.§ 1602(aa)(emphasis added).   In the matter *sub judice*, the payment of the yield spread premium to the broker- Carnegie Financial- is paid and derived from the stream of interest generated <u>over the life of the loan</u>, and is not "payable by the consumer at or before the time of closing."  Accordingly, the yield spread premium is not included the Points and Fees Test calculation set forth in 15 U.S.C. § 1602.  <u>See</u> <u>Noel v. Fleet Finance, Inc.</u>, 971 F.Supp. 1102, 1106-07 (E.D. Mich. 1997).[11]  The disclosure requirements of HOEPA were therefore not implicated in the transaction at issue.  For this reason, the Balkos' Complaint fails to state a claim under TILA (as modified by HOEPA) and Count 2 of the Complaint must be dismissed.[12]

---

[11] The Court rejects the Balkos' contention that the lender had a duty to separately disclose the yield spread premium.  The Court rejects such a theory because the premium is included in the finance charge assessed by the lender against the borrower. <u>In re Bell</u>, 309 B.R. at 153("Even if the yield spread premium in this case is part of the finance charge, it clearly was not paid by the Debtor at or before closing.  Therefore, the yield spread premium is not included in the points and fees calculation"); <u>Stump v. WMC Mortgage Corp.</u>, No. Civ.A.02-326, 2005 WL 645238 (E.D. Pa. March 16, 2005)(because yield spread premiums are paid out as interest over the course of the life of the mortgage, they are already included in the total finance charge as a higher interest rate and should not be "double-counted" by being listed as a separate itemized finance charge); <u>Strang v. Wells Fargo Bank, N.A.</u>, No. Civ.A. 04-CV-2865, 2005 WL 1655886 (E.D. PA. July 13, 2005)(yield spread premiums are incorporated into higher interest rates and therefore should not be double-counted).

[12] The debtors acknowledged at the hearing on this matter that they hold no garden variety TILA claims if the heightened disclosure requirements of HOEPA do not apply.  For example, counsel for the Balkos acknowledged to the Court at the May 26, 2006 hearing that "I believe that if you rule against me on the HOEPA issue, that is

(continued...)

## Count 3
## __Common Law Fraud__

Count 3 of the plaintiffs' Complaint alleges "fraud" against all of the named defendants.  While the Complaint filed by the Balkos is convoluted, their claim for "fraud" seems to revolve around generic allegations that all defendants acted in concert to defraud the Balkos by inducing the Balkos to procure a loan that they could not afford.  The defendants have objected to Count 3 of the Complaint citing the lack of specificity and particularity of such claims.   The Court finds that the objections of the defendants in this regard do have merit with respect to J.P. Morgan and Paragon.

As a general matter, Federal Courts of the United States adhere to "notice pleading." FedR.Civ.P. 8(a)(2).  This system of pleading merely requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Id. There are certain times however, when the Federal Rules require more specific pleading on the part of a complainant.  Titled "Pleading Special Matters," Fed.R.Civ.P. 9 deals with such instances.  These "special matters" include, among other things, averments of fraud or mistake. Fed.R.Civ.P. 9(b).  In pleading these claims, "the circumstances constituting fraud or mistake shall be stated with particularity."  Id.  There are several sound reasons for such a particularity requirement, the most important being to provide defendants with proper notice of the claims against them and to provide increased protection for their reputations.

---

[12](...continued)
really the crux of our TILA claim," and "I believe that material disclosures [under TILA] were given."  The debtors do appear to allege in their papers that some sort of violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*, occurred in this case.  The pleadings filed by the debtors are not entirely clear, but they seem to suggest that a RESPA violation occurred as a result of the alleged failure of Carnegie Financial and/or Paragon to timely provide an accurate "good faith estimate" required by RESPA. 12 U.S.C. § 2604. Case law makes clear that RESPA does not provide a private right of action to remedy violations of 12 U.S.C. § 2604.  See Brophy v. Chase Manhattan Mortgage Co., 947 F. Supp. 879, 881-83 (E.D. Pa. 1996).

In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997).  Also, such a particularity requirement helps to reduce the number of frivolous lawsuits brought solely to extract settlements.  Id.

The Federal Rules' heightened pleading standard regarding fraud and mistake is inherently applicable when dealing with federal statutory claims, such as securities fraud and racketeering allegations.  Id.  Quite often, however, in such circumstances the court is called upon to also analyze  ancillary claims for common law fraud under the laws of the various states.  While the factors pertaining to such a cause of action may be derived from state law principles and jurisprudence, the particularity requirement contained within Rule 9(b) applies equally to common law fraud claims as well.  See Williams v. WMX Technologies, Inc., 112 F.3d 175, 177 (5th Cir. 1997)(finding no principled reason why state law fraud claims should escape pleading requirements of federal rules), cert denied, 522 U.S. 966, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997).  For this reason, a claim of common law fraud founded upon state law must be addressed with Rule 9(b) in mind.

When pleading a claim for fraud, the particularity language in Rule 9(b) requires a plaintiff to specify the time, place and substance of the defendant's alleged fraudulent conduct.  See U.S. ex. rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc., 149 F.3d 227, 234 (3d Cir. 1998) citing Cooper v. Blue Cross & Blue Shield of Florida, 19 F.3d 562, 567 (11th Cir. 1994).  The claimant must allege more than mere conclusory allegations of fraud or the technical elements of the same.  In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1418.  In a case involving multiple defendants, "the complaint should inform each defendant of the nature of his alleged participation in the fraud," and should not vaguely attribute allegedly fraudulent statements simply to all "defendants."  DiVittorio v. Equidyne

00000290.WPD

-14-

Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987);  Mills v. Polar Molecular Corp.,
12 F.3d 1170, 1175 (2d Cir. 1993); see also Balabanos v. North American Inv. Group, Ltd.,
708 F.Supp. 1488, 1493 (N.D. Ill. 1988) (stating that in cases involving multiple defendants
"the complaint should inform each defendant of the specific fraudulent acts that constitute
the basis of the action against the particular defendant").  This "fair notice" to defendants
is "perhaps the most basic consideration underlying Rule 9(b)."  See  Brooks v. Blue Cross
and Blue Shield of Florida, Inc., 116 F.3d 1364, 1381 (11th Cir. 1997) citing Vicom, Inc. v.
Harbridge Merchant Servs., Inc., 20 F.3d 771, 778 (7th Cir. 1994).  Consequently, "lumping"
multiple defendants in a group (e.g., "defendants misled the plaintiff by stating...") defeats
this notice objective and is therefore improper under Rule 9(b).

Count 3 of Plaintiffs' Complaint is styled as "Fraud" against "All Defendants."  The
various "fraud claims" alleged by the plaintiffs fail to allege any specific fraudulent conduct
attributable to J.P. Morgan and/or Paragon.  Indeed, upon several readings of the
document, the Court cannot discern any.

At its most basic level, the Complaint alleges that a conspiracy of some sort was
perpetrated by the various defendants in order to defraud the Balkos.  Similar to claims of
fraud, a claim of conspiracy to defraud is also subject to the particularity requirements of
Rule 9(b).  See Hayduk v. Lanna, 775 F.2d 441, 443 (1st Cir. 1985) (applying Rule 9(b)
particularity requirements to claim for conspiracy to defraud); Segal v. Gordon, 467 F.2d
602, 607 (2d Cir. 1972) (same); Klein v. Council of Chem. Ass'ns, 587 F.Supp. 213, 226-27
(E.D. Pa. 1984) (same); but see U.S. ex rel. Atkinson v. Pa, Shipbuilding Co., No. Civ.A. 94-
7316, 2000 WL 1207162 (E.D. Pa. August 24, 2000).

To use the term "lumping" to describe the allegations against all defendants in Count 3 of the Complaint would be a generous characterization. By way of example, paragraph 84 of the Complaint begins: "The Defendants conspired together and acted in concert to defraud the Plaintiffs in some or all of the following particulars:" and then proceeds to set forth various generic misdeeds committed by unidentified actors.[13]  In doing so, the plaintiffs have miscarried their burden to state a claim for fraud with particularity required under Rule 9(b) against J.P. Morgan and/or Paragon.

Indeed, it appears to the Court that plaintiffs' cause of action against J.P. Morgan and Paragon in Count 3 even fails to adhere to the more relaxed notice pleading standard of Rule 8(a) of the Federal Rules of Civil Procedure. The Court reaches this conclusion because the Complaint is devoid of any allegations of wrongful conduct committed by Paragon and/or J.P. Morgan.

---

[13]  The catch-all contentions of "fraud" and "conspiracy" *appear* to be that: (1) " the defendants" used a fraudulent appraisal in order to obtain an unaffordable loan for the plaintiffs, the ultimate goal being to "flip" the defendants house and "reap profits and fees and costs," [see Complaint at ¶¶ 84(B) and (E)]; (2) "the defendants" misled the plaintiffs "as to the true nature of the financing, including switching the interest rate "at the last minute," [Id. at ¶¶ 84(A) and (D)]; (3) "the defendants" each "committed fraud by breaching their fiduciary duty to the Plaintiffs," misled the plaintiffs as to the "necessity" and "benefits" of refinancing their home, and represented to the plaintiffs that they were receiving credit "under the most favorable conditions" when there was in fact credit available "under more favorable conditions," [Id. at ¶¶ 84(C), (G), (H), (I), and (J)]; and (4) "the defendants" each "padded" the loan fees "to maximize profits for the broker and lender at the expense of the borrower," [Id. at ¶ 84(F)].  Nowhere in the Complaint, however, do the Balkos specifically spell out what role each defendant played in the "scheme" or identify any specific employees (other than Mr. Behrens of Carnegie Financial) of each defendant who participated in the alleged "schemes."  In fact, at its most basic level, the Balkos complain that Mr. Behrens failed to honor his alleged promises.  Nothing in the Complaint ties Mr. Behrens alleged  promises to the remaining defendants, including J.P. Morgan or Paragon.  Nor does the Complaint indicate the legal basis on which the Balkos claim the defendants were fiduciaries of the plaintiffs.  Nor does the Complaint identify how the Balkos could have detrimentally relied upon an appraisal provided by Allegheny Appraisals and Chet Underhill, when the Balkos received the benefit of the March 2003 loan and nothing in the Complaint indicates that the appraisal was actually provided to the Balkos before the closing of the loan.  In fact, the documents attached to the Complaint reflect that the appraisal was provided to Carnegie Financial for the purpose of underwriting the loan. See Id. at Exhibit A.  Therefore, it appears that the lender who ultimately made the loan was the person or entity that relied on the appraisal.

Because plaintiffs have failed to adequately plead their fraud cause of action, Count 3 against Paragon will be dismissed without prejudice.  With respect to the fraud claim against J.P. Morgan, the Court dismisses Count 3 with prejudice.  Dismissal of Count 3 with prejudice as to J.P. Morgan is appropriate because counsel to the Balkos acknowledged at the hearing on this matter that J.P. Morgan had no involvement whatsoever with the solicitation, underwriting, or closing of the March 2003 loan.  In fact, it was acknowledged that J.P. Morgan's involvement in this case merely arises as a result of the fact that Paragon had, subsequent to closing of the loan, pooled and securitized the note and mortgage executed by the Balkos.  Consequently, as of the date the Balkos commenced this bankruptcy, J.P. Morgan, as trustee, was the holder of the note and mortgage and for this reason the Balkos named J.P. Morgan as a defendant to this action.  Under these circumstances, it is undisputed that J.P. Morgan neither participated, caused, encouraged, aided and/or solicited any of the alleged fraudulent activities complained by the Balkos. It is also undisputed that none of the defendants were acting in an agency capacity vis-a-vis J.P. Morgan.[14]  For these reasons, the Court finds that  no relief could be granted under Count 3 in favor of the plaintiffs against J.P. Morgan under any set of facts that could be proved consistent with the allegations in the complaint.  As such, Count 3 must be dismissed with prejudice insofar as the claims asserted against J.P. Morgan.[15]

---

[14] Counsel to the plaintiffs acknowledged at the May 26, 2006 hearing that J.P. Morgan asserted absolutely no control over the activities of the other defendants.

[15] The Court is mindful that at the hearing on the Motion to Dismiss plaintiffs contended that Article 3 of the Uniform Commercial Code (the "UCC") allows the Balkos to pursue affirmative fraud claims against J.P. Morgan.  When pressed for authority supporting this proposition, counsel for the Balkos offered none.  The Court submits that the Balkos reading of Article 3 of the UCC is somewhat misguided.  While UCC § 3-305 provides that certain types of fraud may, under some circumstances, be a defense against the right of a payee or transferee to enforce a negotiable instrument (see footnote 18, infra), UCC §3-305 does not provide for the recovery of affirmative damages against the assignee of such an instrument.  See In re Grayboyes, Civ. A. 05-1780, 2006 WL

(continued...)

With respect to the remaining defendants, Carnegie Financial, Joseph Behrens, Allegheny Appraisals, and Chet Underhill, the Court will not dismiss the common-law fraud claim located at Count 3 at this time.  The Court recognizes that some of these defendants have asserted various theories as to why the fraud claims contained in Count 3 of the lawsuit should be dismissed (such as by reason of passing of statute of limitations, the "gist of the action doctrine," etc.).  The Court, however, declines to accept the arguments of the remaining defendants at this early stage of the case.  It is the Court's opinion that the Complaint adequately puts Carnegie Financial, Joseph Behrens, Allegheny Appraisals and Chet Underhill on notice of the sort of claims asserted by the Balkos against them.  The remaining defendants can assert such defenses either at summary judgment or at trial.

### Count 4
### Violation of Pennsylvania's Unfair Trade
### <u>Practices and Consumer Protection Act</u>

Count 4 of the plaintiffs' Complaint alleges various violations of 73 P.S. § 2181 *et seq.* (the "Credit Services Act") and 73 P.S. § 201-1 *et seq.* (the "Unfair Trade Practices and Consumer Protection Law - UTPCPL").  (<u>See</u> Complaint at ¶¶ 84-91).  As these statutes provide for a cause of action in some instances of fraudulent and/or deceptive conduct, this Court determines the heightened pleading standards of Rule 9(b) are applicable. <u>See</u> <u>e.g.</u> <u>In re Suprema Specialists, Inc.</u>, L438 F.3d 256, 270-272 (3d Cir. 2006) (holding that causes of action sounding fraud like are subject to the heightened pleading requirements of Rule 9(b)); <u>Learning Express, Inc. v. Ray-Matt Enterprises, Inc.</u>, 74 F. Supp. 2d. 79, 87 (D. Mass. 1999) (holding that the pleading requirements of Rule 9(b) are required with respect to an

---

[15](...continued)
437546 at *3 (E.D. Pa. Feb.22, 2006) (stating that there are "several requirements" to the applicability of the equitable doctrine of recoupment under Pennsylvania law, one being that it "must be asserted defensively" ).  For this reason, the Court also rejects the Balkos' affirmative claim for fraud against J.P. Morgan.

action based on the New Jersey Consumer Fraud Act); <u>see also</u> <u>Fass v. State Farm Fire and</u>

<u>Casualty Company</u>, C.A. No. 06-02398, 2006 WL 2129098 at *2 (E.D. Pa. July 26, 2006).

This conclusion is consistent with the fact that Rule 9(b) serves several purposes, including,

to place defendants on fair notice of the claims made against them, to safeguard defendants

against spurious accusations and to enable defendants to protect themselves from the

resulting reputational harm. <u>See</u> Baicker-McKee et al., <u>Federal Civil Rules Handbook</u> at 258

(Thomson West, 2003).[16]   For the reasons discussed above relating to the fraud claims, it

appears that the Balkos have not adequately pled violations of the Unfair Trade Practices

Act and Credit Services Act against Paragon and J.P. Morgan.  In fact, it appears to the

Court that even under the more liberal pleading requirements of Rule 8(a), the Balkos have

not adequately plead a cause of action against Paragon and J.P. Morgan.  The Court reaches

this conclusion because there are no facts alleged in the Complaint which actively place

Paragon and J.P. Morgan in the marketing or solicitation of the March 2003 loan.  The

Court therefore dismisses Count 4 against Paragon without prejudice, and dismisses Count

4 against J.P. Morgan with prejudice.[17]

---

[16] Some courts have concluded that since various unfair trade practices statutes regulate deceptive conduct, as well as fraudulent conduct, claims made merely on deceptive practices need not be plead with specificity. <u>See</u> <u>e.g.</u> <u>Christopher v. First Mutual Corp.</u>, No. Civ.A. 05-01149, 2006 WL 166566 at *3 (E.D. Pa. Jan. 20, 2006).  This Court declines to follow such decisions, and holds that there is no material pleading difference between "deceptive" conduct and "fraudulent" conduct.  Indeed, the term "deception" is very similar to fraud, and is defined as "intentional misleading by falsehood spoken or acted." <u>Id</u>. (citing <u>Black's Law Dictionary</u> 406 (6th ed. 1990)). <u>Cf</u>. <u>U.S. ex rel. Clausen v. Lab. Corp. of America, Inc.</u>, 290 F.3d 1301, 1308-09 (11th Cir. 2002)(holding that Rule 9(b) applies to claims made under the False Claims Act).

[17] The Credit Services Act regulates activities of "credit service organizations" and "loan brokers." Dismissal of the Credit Services Act claim against J.P. Morgan also appears appropriate because J.P. Morgan is not a "credit services organization" under the statute.  Specifically, the statute, at 73 P.S. § 2182, expressly excludes any bank or trust company from being a "credit services organization" under the statute.  No party to the litigation disputes the fact that J.P. Morgan is either a bank or trust company.  In addition, the plaintiffs Complaint fails to allege that J.P. Morgan is a "loan broker," and plaintiffs made no averment or argument at the May 26, 2006 hearing to the effect that J.P. Morgan is a "loan broker" for purposes of the Credit Services Act.  Moreover, because J.P.

(continued...)

With respect to the remaining defendants, Carnegie Financial, Joseph Behrens, Allegheny Appraisals, and Chet Underhill, the Court will not dismiss the state law consumer protection causes of action located at Count 4 at this time. Each of these defendants may renew their defenses at appropriate stages later in this litigation (i.e., at summary judgment or at trial).

## Count 1
## Objection to Claim/Request for Recoupment

Count 1 of the plaintiffs' Complaint is captioned as an objection to the claim of J.P. Morgan and is in the nature of a "request for recoupment." The plaintiffs allege in their Complaint that the proof of claim filed by J.P. Morgan "does not accurately reflect the proper amounts due as it does not account for the Plaintiffs' common law recoupment rights especially due to the original fraud and truth-in-lending violations by the mortgagor [sic]." (Complaint at ¶ 72). Because the legal predicate(s) for the Balkos' recoupment claims appear to be the substantive claims for relief contained in Counts 2, 3 and 4 of their Complaint, and because Counts 2, 3 and 4 of the Complaint are dismissed as to J.P. Morgan, the Court concludes that the Balkos' objection to the J.P. Morgan claim is without merit.[18] Consequently, the Court overrules the objection.[19]

---

[17](...continued)

Morgan had no involvement in this case until well after the closing of the March 23, 2006 loan, the Court is unable to discern any colorable claim that the Balkos may have against J.P. Morgan under the Credit Services Act.

[18] The Court recognizes that in their Response Memorandum to Defendant J.P. Morgan's Motion to Dismiss (Document No. 26), the plaintiffs have asserted recoupment rights against J.P. Morgan under Article 3 of the UCC. The Balkos contend in their Response Memorandum that if any of the defendants are found to have defrauded the Balkos, Article 3 of the UCC may provide the Balkos with recoupment rights against J.P. Morgan "because they [the Balkos] have made allegations of fraud in the inducement." The Balkos further allege that "Pennsylvania law provides that a holder in Due Course [sic] is not protected against an allegation of fraud in the inducement made by the maker of the note. **13 Pa.C.S.A. 3305** .[sic]" The Balkos, however, misconstrue Article 3 of the UCC. According to Pennsylvania law, every holder of a negotiable instrument is deemed, *prima facie*, a holder in due course subject to a rebuttable presumption to the contrary. See Morgan Guaranty Trust Co. of New

(continued...)

## IV. __CONCLUSION__

This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Bankr.P. 7052. For reasons set forth more fully in this Memorandum Opinion, the Court concludes that the Motion to Dismiss, in part, is well founded and, as a result: (1) Count 1 of the Complaint (as it relates to the debtors' objection to claim and purported claim sounding in recoupment) against J.P. Morgan shall be dismissed without prejudice; (2) Count 2 of the Complaint (Truth in Lending Act claims) shall be dismissed as to all defendants for failure to state a claim upon which relief may be granted; (3) Count 3 (common-law fraud claims) shall be dismissed as to J.P. Morgan and Paragon for lack of specificity in pleading and for failure to state a claim upon which relief could be granted; said dismissal shall be with prejudice as to J.P. Morgan and without prejudice as to Paragon; and (4) Count 4 (Pennsylvania Unfair Trade Practices and Consumer Protection Act claims) shall be dismissed as to J.P. Morgan and Paragon for lack of specificity in pleading and failure to state a claim upon which relief could be granted; said dismissal shall be with prejudice as to J.P. Morgan and without prejudice as to Paragon. The Court denies the Motion to Dismiss with respect to the causes of action

---

[18](...continued)
York v. Staats, 631 A.2d 631, 636 (Pa. Super. 1993). Therefore, without specific allegations to the contrary, J.P. Morgan, as holder of the note, is a holder in due course. It is well-established that fraud in the factum is a defense under § 3-305 of the UCC, while fraud in the inducement is not. See Exchange International Leasing Corp. v. Consolidated Business Forms Co., Inc., 462 F.Supp. 626, 628 (W.D. Pa. 1978). Fraud in the factum, also known as "real" or "essential" fraud, is commonly depicted in terms of "a maker who is tricked into signing a note in the belief that it is merely a receipt or some other document. The theory of the defense is that the signature on the instrument is ineffective because the signer did not intend to sign such an instrument at all." See 13 Pa.C.S.A. § 3305, Comment 1. The fraud in this case, as alleged by the plaintiffs, consists of fraud in the consideration for, or in negotiations leading up to, the execution of a negotiable instrument; not in the execution of the note itself in favor of the lender. The Balkos' Complaint therefore fails to adequately plead fraud in the factum, and their reliance on UCC § 3-305 is misplaced.

[19] Having dismissed Counts 1 through 4 of the Complaint against both J.P. Morgan and Paragon, the Court does not at this time address any of the various other defenses asserted by these parties in this proceeding.

asserted in Counts 3 and 4 against defendants Carnegie Financial, Joseph Behrens,
Allegheny Appraisals, and Chet Underhill.  An Order consistent with this Memorandum
Opinion shall be issued.


Dated: August 24, 2006          _____/s/ Jeffery A. Deller_____
                                       Jeffery A. Deller
                                       United States Bankruptcy Judge.